IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      )
                              )
        v.                    )      Criminal No. 06-299
                              )
ALVIN THOMAS                  )

O P I N I O N

DIAMOND, D.J.

On August 30, 2006, defendant Alvin Thomas and his co-defendant Rodney Duane Allen were charged in a three-count indictment with conspiracy to distribute 5 kilograms or more of cocaine from 1998 to August 2006, in violation of 21 U.S.C. §846, and two counts of distribution and possession with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(A)(ii).

On May 19, 2009, Thomas filed the following pretrial motions: (1) motion to suppress recordings of electronic surveillance (Document No. 163); (2) motion for bill of particulars (Document No. 164); (3) motion for discovery regarding recorded phone calls pertaining to defendant (Document No. 165); (4) motion to compel disclosure of plea bargains, preferential treatment and promises to government witnesses (Document No. 166); (5) motion to suppress evidence (Document No. 167); (6) motion for additional discovery (Document No. 168); (7) motion to dismiss (Document No. 169); (8) motion for early disclosure of Jencks Act material (Document No.

170); (9) motion for disclosure of additional Rule 404(b) evidence (Document No. 171); (10) motion to prohibit disclosure of Jencks material in the jury's presence (Document No. 172); (11) motion to require law enforcement personnel to retain rough notes (Document No. 173); (12) motion to require the government to reveal any agreement, concession or grant of immunity (Document No. 174); (13) motion for James Hearing (Document No. 175); and (14) motion for leave to file additional pretrial motions (Document No. 176). On June 16, 2009, the government filed a consolidated response to defendant's pretrial motions (the "Response") (Document No. 180).

A hearing on Thomas' motion to suppress evidence originally was scheduled for July 22, 2009, but was continued when Attorney Alonzo Burney, who was Thomas' third court appointed-lawyer, was granted leave to withdraw from this case. Thomas' current counsel, Attorney James Brink, then was appointed to represent him, and the suppression hearing was rescheduled for August 27, 2009. The court subsequently granted Thomas' motion to continue the suppression hearing to afford Attorney Brink adequate time to prepare. The suppression hearing was held on October 19, 2009. For the reasons set forth herein, Thomas' motion to suppress evidence will be granted in part and denied in part, and his other pretrial motions will be ruled upon as set forth herein.

2

## I.   **Factual Background**

At the suppression hearing, Drug Enforcement Administration ("DEA") Agent Scott Smith testified on behalf of the government, and Thomas testified on his own behalf.  The court finds that the evidence presented at the hearing establishes the facts that follow.

Agent Smith testified that he participated in the investigation of Thomas and others in connection with alleged cocaine trafficking.  Transcript ("Tr.") of Suppression Hearing held October 19, 2009, at 10.  In early June 2006, Agent Smith approached an individual identified as Confidential Source 1 ("CS1") to solicit his cooperation relative to the investigation of Thomas.  Tr. at 10-11.  CS1 agreed to cooperate and entered into a cooperation agreement with the government.  Tr. at 11, 44.  As part of his cooperation, CS1 agreed to tape record a conversation with Thomas by using a digital recording device.  Tr. at 11.

CS1 told Agent Smith that he and Thomas normally discussed their business in person.  Tr. at 50.  Indeed, Thomas admitted that he had traveled to Pittsburgh on numerous occasions to meet with CS1.  Tr. at 95, 99.  The normal procedure was that Thomas would fly from Atlanta to Pittsburgh for a short period of time, and CS1 and Thomas would either talk at the airport or drive a short distance while conducting their discussion and then CS1

3

would return Thomas to the airport. Tr. at 77. Agent Smith instructed CS1 to try to arrange such a meeting with Thomas. Tr. at 50.

CS1 contacted Agent Smith on July 15, 2006, to advise that he and Thomas made plans for a face-to-face meeting, and Thomas confirmed plans to fly from Atlanta to Pittsburgh later that day to meet with CS1. Tr. at 49-50, 51. Thomas admitted that he agreed to meet with CS1 on July 15, 2006, and that he bought his own airplane ticket to Pittsburgh. Tr. at 94.

Investigators confirmed that Thomas had obtained a flight from Atlanta to Pittsburgh that was scheduled to arrive at 2:41 p.m. on July 15, 2006. Tr. at 13, 55. Agent Smith and several investigators observed Thomas inside the airport terminal at approximately 3:00 p.m. on that day. Tr. at 13, 55. The agents did not maintain constant surveillance of Thomas after they identified him in the airport because they were scheduled to meet at a predetermined location to coordinate surveillance of the planned meeting between CS1 and Thomas. Tr. at 12, 13-14, 51, 52, 56.

Agent Smith asked CS1 to meet him at a predetermined location at 4:00 p.m. Tr. at 51, 52, 60. When they met, CS1 agreed to record his conversation with Thomas. Tr. at 13. At that point, Agent Smith conducted a search of CS1 and his vehicle, and he spoke to CS1 about the expectations for the meeting between CS1

4

and Thomas.  Tr. at 14-15.  Agent Smith then placed a digital recording device in CS1's vehicle in the front center console area and set it to record.[1]  Tr. at 15, 52-53.  Agent Smith instructed CS1 to try to engage Thomas in conversation about previous cocaine transactions between the two of them, as well as the possibility of obtaining additional cocaine from Thomas.  Tr. at 60.

The agents conducted surveillance of CS1's vehicle as he left the predetermined meeting location and traveled to the airport to pick up Thomas.  Tr. at 15.  At approximately 4:21 p.m., the agents re-established visual surveillance of Thomas when he approached CS1's vehicle outside of the airport terminal, placed a bag inside the vehicle and entered the vehicle.  Tr. at 15, 60, 66.  Agent Smith testified that Thomas did not appear to be intoxicated and that he voluntarily entered CS1's vehicle.[2]  Tr. at 16.  Thomas admitted that he "had no problem getting in the car

---

[1]Agent Smith testified that the recording device was capable of transmitting so that the agents could listen to the conversation as it was occurring.  Tr. at 15.  However, because of the equipment's range, agents only could maintain audio surveillance of parts of the meeting between CS1 and Thomas on July 15, 2006; nonetheless, the entire meeting was recorded.  Tr. at 15.

[2]Thomas testified that he had taken narcotic pain medication earlier in the day on July 15, 2006, to control pain that he experienced as a result of a recent hernia operation.  Tr. at 81-82.  Thomas also testified that he drank alcohol before and during the flight from Atlanta to Pittsburgh, and had another drink at the airport after arriving in Pittsburgh.  Tr. at 83, 84.  Thomas did not testify, however, that he was impaired in his ability to understand, communicate and make decisions as a result of the pain medication and alcohol.

5

with [CS1]."  Tr. at 88.

Thomas met with CS1 in his vehicle for approximately 30 minutes.  Tr. at 16.  Agent Smith testified that the plan was for CS1 and Thomas to drive around while conducting their meeting, "whether that meant driving around the airport, parking, or driving the distance from the airport and returning" depending on the situation and the interaction between CS1 and Thomas.  Tr. at 61.  After picking up Thomas, CS1 drove his vehicle out of the airport complex and onto the highway.  Tr. at 61.  Thomas testified that he did not want to go on a ride with CS1 because he was concerned he might miss his return flight to Atlanta.  Tr. at 88, 89, 99.

Agents followed CS1's vehicle, but they were unable to maintain visual surveillance of the vehicle on the highway at all times.  Tr. at 61.  However, based on the transmitted audio recording from CS1's vehicle, it was apparent to the agents that the vehicle was heading back to the airport.  Tr. at 62.

At 4:51 p.m., Task Force Officer Robert Voinovich re-established visual contact with CS1's vehicle, and observed the vehicle travel back into the airport complex near the Hyatt hotel.  Tr. at 62-63.  Thomas exited the vehicle and went into the lobby of hotel, which connects to the airport by a walkway.  Tr. at 18, 63, 65, 71.  At 4:56 p.m, Task Force Officer Oesterle observed Thomas proceed through the airport security checkpoint, and at

6

5:12 p.m., Thomas boarded a flight back to Atlanta.  Tr. at 18, 63.  In sum, the meeting between CS1 and Thomas that occurred on July 15, 2006, was consistent with the procedure of past meetings between the two men.  Tr. at 77-78.

After CS1's meeting with Thomas, Agent Smith met with CS1 to debrief him and retrieve the recording device from his vehicle. Tr. at 18, 71.  Agent Smith maintained custody of the recording device until the recorded material was downloaded onto a compact disk.  Tr. at 54.  Agent Smith could not recall if he personally downloaded the recording to a disk, or if someone from the technical staff in his office performed that task.  Tr. at 54. Agent Smith testified, however, that he knew how to download recorded material from the digital recording device onto a compact disk.  Tr. at 54.  After the recording was downloaded onto a compact disk, copies were made for distribution to the U.S. Attorney's office, and the original was placed into evidence.  Tr. at 55.

Agent Smith testified that the recorded conversation between CS1 and Thomas included their discussion of past cocaine transactions between them, as well as discussion of a future cocaine transaction in which Thomas would provide cocaine to CS1. Tr. at 16.  Thomas' testimony confirmed that he and CS1 discussed a shipment of 11 kilograms of cocaine that had occurred in May 2006, and a future shipment of 9 kilograms of cocaine.  Tr. at 97.

7

CS1 and Thomas also discussed the prices applicable to both the past and future cocaine transactions and how they would divide the profits.  Tr. at 16-17.  Agent Smith testified that the recording revealed Thomas was coherent, his speech was clear and he did not appear to be intoxicated during his conversation with CS1.  Tr. at 17.  Further, Agent Smith testified that CS1 did not threaten Thomas in any way during their conversation.  Tr. at 17.

Agent Smith also testified about information that he received from an individual identified as Confidential Source 2 ("CS2") concerning conversations CS2 had with Thomas while they both were incarcerated in the same cell at the Allegheny County Jail.[3]  Tr. at 19-30.  On October 5, 2007, CS2's attorney contacted the U.S. Attorney's Office to advise that CS2 had information that Thomas allegedly was plotting the murder of CS1 and had requested CS2's assistance in connection with the plot.  Tr. at 19, 32, 76-77.  On that same date, Agent Smith and other investigators met with CS2 when he was released from the Allegheny County Jail on a furlough. Tr. at 19-20.

CS2 explained that Thomas knew CS2 was going to be released from jail on a furlough, and Thomas had asked CS2 to contact Thomas' sister, who would in turn put CS2 in contact with a third person later identified as Carlton Jenkins.  Tr. at 21, 23.

---

[3]Agent Smith testified that the government did not make any arrangements initially to have CS2 housed in the same cell with Thomas.  Tr. at 19.

Thomas instructed CS2 to inform Jenkins that the government had approached Thomas about cooperating against Jenkins, but he had not agreed to do so. Tr. at 21. As a result, Thomas wanted Jenkins to do a favor for him, which was to murder CS1. Tr. at 21-22. Thomas provided CS2 with CS1's address and told CS2 to give that information to Jenkins. Tr. at 22.

As a result of the information provided by CS2, Agent Smith had CS2 place a telephone call to Thomas' sister, which was consensually recorded. Tr. at 23. CS2 asked Thomas' sister to put him in contact with the third-party who Thomas had referred to, and his sister knew to contact Carlton Jenkins. Tr. at 23. CS2, Thomas' sister and Jenkins engaged in a three-way conversation, during which CS2 explained to Jenkins the information that Thomas had asked him to convey. Tr. at 23-24. Jenkins seemed to understand what CS2 was talking about regarding Thomas' situation. Tr. at 24. Based on the three-way conversation, Agent Smith determined that CS2's information concerning Thomas' alleged plot to murder CS1 was credible. Tr. at 24.

When CS2 returned to jail from his furlough, Agent Smith obtained permission from jail authorities to place a recording device on him. Tr. at 25. CS2 originally had been assigned to a jail cell with Thomas, and Agent Smith requested that CS2 be returned to that same cell when he returned from his furlough.

9

Tr. at 35.   Agent Smith instructed CS2 to engage in conversation with Thomas regarding his alleged plot to murder CS1, but not to discuss the instant drug charges pending against Thomas.   Tr. at 25-26, 35.   Agent Smith put the recording device on CS2 and set it to record.   Tr. at 37, 39.   Agent Smith left the jail and returned almost five hours later to retrieve the recording device from CS2.   Tr. at 41.   At that time, CS2 told Agent Smith that he had a conversation with Thomas which was captured on the recording device.   Tr. at 25, 26, 41.   Agent Smith testified that the purpose of having CS2 record the conversation with Thomas was to investigate Thomas' alleged plot to murder CS1, not to obtain evidence against Thomas relative to the pending drug trafficking charges.   Tr. at 30.

## II.   <u>Defendant's Motion to Suppress Evidence (Document No. 167)</u>

Thomas has moved to suppress his recorded statements concerning drug transactions that he made to CS1 during the meeting that took place on July 15, 2006, in CS1's vehicle.   In addition, Thomas seeks suppression of his recorded conversation with CS2 at the Allegheny County Jail on October 9, 2007.   In essence, Thomas contends that both CS1 and CS2 acted as agents of law enforcement,[4] that he was, in effect, "in custody," and as a

---

[4]Attorney Brink candidly admitted at the suppression hearing that he "could find no case on point talking about whether a confidential source or informant directly controlled by the police

10

result, CS1 and CS2 should have given him a <u>Miranda</u> warning before allegedly interrogating him. Finally, Thomas requests that the court suppress statements he made to the government during proffer sessions after he was arrested.

Thomas first contends that CS1's meeting and conversation with him on July 15, 2006, in CS1's vehicle constituted custodial interrogation, which implicated his right to a <u>Miranda</u> warning. Thomas contends that the government, by using CS1 as its agent, solicited the July 15, 2006, meeting with Thomas in Pittsburgh, knowing that he was addicted to alcohol and marijuana, that he took other medications, and that he experienced anxiety due to past trauma and because he had to travel to Pittsburgh by airplane. <u>See</u> Document No. 167, ¶¶4-6; Tr. at 101-02. Thomas asserts that CS1, who he alleges had a history of violent behavior, placed him "in an environment that was tantamount to arrest by its restrictive nature", and then CS1 interrogated Thomas and obtained incriminating statements from him. <u>See</u> Document No. 167, ¶¶7, 9-10. Thomas contends that he was not given a <u>Miranda</u> warning, that his statements were not voluntary, and that an audio tape of CS1's meeting with him was made without his knowledge and consent. <u>Id</u>., ¶¶12, 13, 15.

Thomas was not subject to custodial interrogation. Custodial interrogation means "questioning initiated by law enforcement

_____

is an agent of the police." Tr. at 102.

officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966). A person is in custody when he either is formally arrested or his freedom of movement is restricted to "the degree associated with a formal arrest." United States v. Willaman, 437 F.3d 354, 359 (3d Cir. 2006).

Despite Thomas' contention that he was in custody because the situation was "tantamount to arrest", he was not under arrest by a law enforcement officer when his conversation with CS1 occurred, thus a Miranda warning was not required. See United States v. Jones, 801 F.2d 304, 315 (8th Cir. 1986) (recording an undercover conversation in a non-custodial situation does not trigger the need for a Miranda warning). Quite simply, there is no basis to suppress Thomas' statements that he made to CS1 because he was not in custody nor subject to any coercion. Indeed, there is no indication that anyone forced Thomas to travel to Pittsburgh to meet with CS1 or to do so under the influence of alcohol or drugs. Moreover, there is no indication that Thomas was forced to enter CS1's vehicle, and Thomas himself admitted that he "had no problem getting in the car with [CS1]." Tr. at 17, 88. Further, there is no indication that CS1 threatened Thomas in any way during their conversation. Although Thomas claims that he did not want to go on a ride outside of the airport complex with CS1, it was not due

12

to coercion or intimidation, but rather because he was concerned he might miss his return flight to Atlanta. Tr. at 88, 89, 99. Under these circumstances, CS1 was not required to give Thomas a <u>Miranda</u> warning, and his motion to suppress on that basis will be denied.

Further, Thomas' argument that his statements should be suppressed because an audio tape of CS1's meeting with him was made without his knowledge and consent lacks merit. Pursuant to 18 U.S.C. §2511(2)(c), it is not unlawful for a person "acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." The Third Circuit has held that the warrantless recording of a conversation with the consent of one of the parties may be admitted into evidence in a federal prosecution, <u>United States v. Armocida</u>, 515 F.2d 49, 52 (3d Cir. 1975), provided that the government introduces clear and convincing evidence of the authenticity and accuracy of the recording. <u>United States v. Starks</u>, 515 F.2d 112, 121 (3d Cir. 1975).

Here, it was established at the suppression hearing that CS1 voluntarily consented to the recording of his conversation with Thomas. Tr. at 11. Thomas has not challenged the authenticity of the recording. Therefore, the audio tape of Thomas' conversation

13

with CS1 is not subject to suppression.

Thomas next seeks to suppress statements he made to CS2 while they both were incarcerated at the Allegheny County Jail, claiming that his Fifth Amendment rights were violated. Here, again, Thomas contends that CS2 was acting as an agent of law enforcement and should have given him a <u>Miranda</u> warning before allegedly interrogating him. <u>See</u> Document No. 167, ¶17; Tr. at 103. The statements in question do not pertain to the instant drug charges against Thomas, but rather concern Thomas' attempt to solicit CS2's assistance in an alleged plot to murder CS1. CS2 was not required to give Thomas a <u>Miranda</u> warning before engaging in conversation with him about the plot to murder CS1, and any statements Thomas made to CS2 concerning that matter are not subject to suppression for Fifth Amendment purposes. <u>See Illinois v. Perkins</u>, 496 U.S. 292, 300 (1990) (holding that an undercover law enforcement officer posing as a fellow inmate is not required to give <u>Miranda</u> warnings to an incarcerated suspect before asking him questions that may elicit an incriminating response).

However, to the extent Thomas claims that his Sixth Amendment right to counsel was violated when CS2 recorded his conversation with Thomas at the Allegheny County Jail, <u>see</u> Document No. 167, ¶¶17, 21, the court finds that Thomas' statements to CS2 must be suppressed on that basis. The Supreme Court's decisions in <u>Massiah v. United States</u>, 377 U.S. 201 (1964), <u>United States v.</u>

14

Henry, 447 U.S. 264 (1980), and Maine v. Moulton, 474 U.S. 159 (1985) hold that the government may not use an undercover agent to circumvent the Sixth Amendment right to counsel once a suspect has been charged with a crime.   More specifically, in Moulton, the Supreme Court held that incriminating statements made by the defendant, after formal charges were filed against him, to his co-defendant, who was operating as an undercover agent for the state, were inadmissible, notwithstanding that the state also had legitimate reasons for recording the defendant's statements to his co-defendant, which included investigating the defendant's alleged plan to kill a state witness and insuring the co-defendant's safety.   Moulton, 474 U.S. at 179-80.

Similar to Moulton, Thomas' statements to CS2 regarding the alleged plot to murder CS1 are inadmissible at trial on the pending drug trafficking charges.   Although no charges had been filed against Thomas relative to the alleged plot to murder CS1 when CS2 recorded his conversation with Thomas about that matter, Thomas was represented by counsel in connection with the pending drug trafficking charges at that time.   As a result, the Sixth Amendment prevents the government from interfering with Thomas' right to counsel, see Moulton, 474 U.S. at 176, and Thomas' recorded statements to CS2 concerning his alleged plot to murder

15

CS1 must be suppressed.[5]

Finally, Thomas seeks to suppress statements he made in connection with proffers provided to the government. See Document No. 167, ¶¶18-20. Thomas' statements were made under the terms of a proffer letter, and the government states that if it intends to use those statements, it will do so in accordance with the terms agreed to by the parties, as well as Fed.R.Evid. 410, which relates to the inadmissability of plea discussions and related statements. See government's Response at 29.

Accordingly, for all of the foregoing reasons, Thomas' motion to suppress statements will be granted in part and denied in part. Thomas' motion to suppress is granted with respect to the recorded statements he made to CS2 at the Allegheny County Jail concerning his alleged plot to murder CS1.  Those statements were obtained in violation of Thomas' Sixth Amendment right to counsel and shall be excluded from use as evidence at his trial on the pending drug trafficking charges.  Thomas' motion to suppress is denied with respect to the recorded statements he made to CS1 on July 15,

---

[5]By this ruling, the court does not suggest that Thomas' recorded statements to CS2 concerning the alleged plot to murder CS1 would be inadmissible in any future proceedings against Thomas in connection with that plot.  See e.g., Perkins, 496 U.S. at 299 (defendant's statement to undercover government agent posing as his cellmate that incriminated him in a murder was not subject to suppression for Sixth Amendment purposes in his murder prosecution where the defendant made the incriminating statement while incarcerated on charges unrelated to murder and prior to actually being charged with murder).

2006, and those statements are admissible at trial.

## III. **Defendant's Other Pretrial Motions**

### A. **Motion to Suppress Wiretap Evidence (Document No. 163)**

Thomas has filed a motion to suppress all evidence obtained through the court authorized electronic surveillance of certain cellular telephones. Thomas asserts the evidence should be suppressed because the government failed to establish the necessity for electronic surveillance. Thomas' argument lacks merit, and his motion will be denied.

From November 17, 2005 until April 14, 2006, DEA agents obtained authorization from the United States District Court for the Western District of Pennsylvania to conduct electronic surveillance on telephones identified as Target Telephones #1-4 which were used by Damaun Dowdy and Randy Ford. The applications to conduct electronic surveillance were supported by affidavits of probable cause submitted by DEA Agent Smith. The applications and orders authorizing the electronic surveillance were filed at Misc. Nos. 05-433, 05-433(a), 05-433(b), 05-433(c), 05-433(d), 05-433(e), 05-433(f) and 05-433(g).

The application and order entered at Misc. No. 05-433 pertained to the interception of Target Telephone #1, which was used by Damaun Dowdy. No conversations involving Thomas were intercepted over that telephone. The application and order

17

entered at Misc No. 05-433(a) authorized the interception of conversations that occurred over Target Telephone #2, which was a second telephone used by Dowdy, and Target Telephone #3, which was used by Randy Ford. Thomas was intercepted only over Target Telephone #3; accordingly, the court construes his motion to suppress wiretap evidence as pertaining to that telephone only.[6] The other applications and orders that pertain to the continued interception of calls over Target Telephone #3 are filed at Misc. Nos. 05-433(c), 05-433(f) and 05-433(g).

Thomas argues that the wiretap evidence should be suppressed because the affidavit of DEA Agent Smith in support of the application to conduct electronic surveillance did not contain a full and complete statement as to whether or not other

---

[6]Thomas has standing to challenge the orders that authorized the interception of calls over Target Telephone #3 because he is an "aggrieved person" with respect to that Target Telephone. See 18 U.S.C. §2510(11) and §§2518(10)(a)(i)-(iii)(defining "aggrieved person" as one "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed" and stating that "any aggrieved person ... may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter ... on the grounds that- (i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." Thomas does not, however, have standing to challenge the orders that authorized the interception of calls over Target Telephones #1, #2 and #4 because he was not intercepted over those telephones. See United States v. Armocida, 515 F.2d 29, 35 n.1 (3d Cir. 1975) (finding that a co-defendant whose conversations were not intercepted over either of two wiretaps on other co-defendants' telephones lacked standing to challenge the admissibility of evidence seized as a result of those wiretaps).

18

investigative procedures had been tried and failed or why they reasonably appeared to be unlikely to succeed if tried or to be too dangerous, as required by 18 U.S.C. §2518(1)(c). In other words, Thomas contends that the government failed to establish that electronic surveillance was necessary to the investigation into the criminal and conspiratorial activity alleged in the indictment. Contrary to Thomas' position, Agent Smith's affidavits filed in support of the applications to conduct electronic surveillance over Target Telephone #3 set forth sufficient facts to establish the need for electronic surveillance.

Before issuing an order authorizing a wiretap, it is required that "the judge determine[ ] on the basis of the facts submitted by the applicant that ... normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(3)(c). The Third Circuit has emphasized that the statutory requirement of necessity does not mandate that the government exhaust all other investigative procedures before resorting to electronic surveillance. <u>United States v. Williams</u>, 124 F.3d 411, 418 (3d Cir. 1997). Instead, it is sufficient if there is evidence that "normal investigative techniques ... reasonably appear to be unlikely to succeed if tried." <u>Id</u>. (quoting 18 U.S.C. §2518(3)(c). To make such a showing, "[t]he government need only lay a 'factual

19

predicate' sufficient to inform the [authorizing] judge why other methods of investigation are not sufficient." United States v. McGlory, 968 F.2d 309, 345 (3d Cir. 1992) (citing United States v. Armocida, 515 F.2d 29, 38 (3d Cir. 1975)). In determining whether this requirement has been satisfied, a court "may properly take into account affirmations which are founded in part upon the experience of specially trained agents." Williams, 124 F.3d at 418 (quoting United States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989)). In this regard, "[t]he government's showing is to be 'tested in a practical and commonsense fashion.'" McGlory, 968 F.2d at 345 (quoting United States v. Vento, 533 F.2d 838, 849 (3d Cir. 1976)).

A review of Agent Smith's affidavits submitted in support of the applications relative to Target Telephone #3 demonstrate conclusively that Thomas' necessity argument is without merit. Specifically, the affidavits indicate the following:

(1)     normal investigative procedures, such as procurement of electronic communication records, including subscriber and telephone toll record information and the operation of pen register and trap and trace devices, had been utilized, but such procedures were unsuccessful in ascertaining the full scope of the narcotics conspiracy under investigation, or in uncovering the identities of all the individuals involved;

(2)     physical surveillance had been conducted, but such surveillance was insufficient to uncover the full scope of the drug trafficking conspiracy;

(3)     trash searches were not practical in this case;

(4)     administrative subpoenas that had been used to obtain

20

certain telephone records were helpful, but the subpoenas had not yielded the type of information expected to be obtained through the use of electronic surveillance;

(5) the use of a grand jury at that time was unlikely to further the investigation;

(6) although confidential sources had been used and would continue to be used, those sources had been unable to furnish information about the full scope of the drug trafficking organization and how it operates;

(7) introducing an undercover officer into the organization was deemed unlikely to succeed because of the reluctance of drug traffickers to introduce new customers to their sources of supply; and

(8) the execution of search warrants would have been premature at that time because the agents had been unable to identify the location of the various stash houses that were being used by the targets of the investigation.

See Affidavits of Agent Smith filed at Misc. No. 05-433(a), ¶¶51-71; at Misc. No. 05-433(c), ¶¶34-53; at Misc. No. 05-433(f), ¶¶40-61; and at Misc. No. 05-433(g), ¶¶63-83.

Based on the foregoing, Agent Smith's affidavits more than established the need for electronic surveillance, the affidavits contained a full and complete statement as to whether or not normal investigative procedures had been tried and had failed or why they reasonably appeared to be unlikely to succeed if tried or to be too dangerous, and the affidavits otherwise complied with the requirements of 18 U.S.C. §2518. Accordingly, Thomas' necessity argument is without merit, and his motion to suppress wiretap evidence will be denied.

21

### B.  **Motion for Bill of Particulars (Document No. 164)**

Thomas has filed a motion for a bill of particulars, in which he generally requests specific dates, names and address of co-conspirators known to the government but not named in the indictment, specific acts and statements made by him, and any acts or statements made by others that may be imputed to him.

The purpose of a bill of particulars is to inform the defendant adequately of the nature of the charges brought against him so as to enable him to prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense. United States v. Rosa, 891 F.2d 1063, 1066 (3d Cir. 1989).  The granting of a bill of particulars is within the discretion of the district court. United States v. Adams, 759 F.2d 1099, 1113 (3d Cir. 1985).

A bill of particulars, unlike discovery, is not intended to provide a defendant with the fruits of the government's investigation, but rather to give the defendant only that minimum amount of information necessary to permit him to conduct his own investigation.  United States v. Smith, 776 F.2d 1104, 1111 (3d Cir. 1985).  Here, the indictment provides the particulars of the charged offenses in sufficient detail to place Thomas on notice of that with which he has been charged and to permit him to conduct his own investigation.  In addition, the government has provided Thomas with a copy of the affidavits filed in support of the

22

electronic and video surveillance in this case, the affidavit filed in support of a search warrant for his residence, compact discs that contain copies of all conversations intercepted during the electronic surveillance and results of the video surveillance. See government's Response at 21.  As no proper purpose for a bill of particulars would be served by ordering one, Thomas' motion will be denied.

### C.  **Motions for Discovery (Document Nos. 165 and 168)**

Thomas has filed an extensive omnibus motion for discovery seeking various categories of information, including inter alia requests for material under Fed.R.Crim.P. 16, as well as exculpatory and impeachment material (Document No. 168).  Thomas also has filed a discovery motion regarding recorded phone calls that pertain to him (Document No. 165).  In that motion, Thomas requests that the government identify all recorded conversations that it claims involve him as a participant or which the government believes may be admissible pursuant to the co-conspirator exception to the hearsay rule.

Generally, governmental disclosure of evidence in criminal cases is governed by Fed.R.Crim.P. 16(a).  The United States Court of Appeals for the Third Circuit has recognized that discovery in criminal cases is limited to those areas delineated in Rule 16(a)(1) "with some additional material being discoverable in accordance with statutory pronouncements and the due process

23

clause of the Constitution." <u>United States v. Ramos</u>, 27 F.3d 65, 68 (3d Cir. 1994). As a general matter, these other areas are limited to the Jencks Act, 18 U.S.C. §3500, and materials available pursuant to the "<u>Brady</u> doctrine."[7] <u>Id</u>.

In response to the omnibus discovery motion, the government has acknowledged its obligations under Rule 16(a) and the <u>Brady</u> doctrine and indicates that it already has turned over all Rule 16 material and that it intends to comply fully with the dictates of <u>Brady</u> and the Jencks Act at the appropriate time. <u>See</u> government's Response at 31-32. Accordingly, Thomas' discovery motion and requests for exculpatory evidence will be granted in part, and the government will be ordered to turn over all information falling within the purview of Rule 16(a) and the <u>Brady</u> doctrine. To the extent Thomas' omnibus discovery motion requests information that does not fall within the scope of Rule 16(a), <u>Brady</u> or the Jencks Act, those requests will be denied.

As to the timing of the required disclosures, it is well settled that the government's obligations under <u>Brady</u> require it to disclose actual exculpatory evidence without undue delay. In contrast, <u>Brady</u> impeachment material ordinarily must be disclosed "in time for its effective use at trial." <u>United States v. Higgs</u>, 713 F.2d 39, 44 (3d Cir. 1983). Accordingly, to the extent the government possesses any exculpatory <u>Brady</u> evidence, such evidence

---

[7]<u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

24

shall be disclosed to Thomas forthwith.

As to impeachment material, this circuit encourages adherence to the long-standing policy of promoting early production of all types of Brady material "to ensure the effective administration of the criminal justice system." United States v. Starusko, 729 F.2d 256, 261 (3d Cir. 1984) (quoting Higgs, 713 F.2d at 44 n.6). However, the Third Circuit has held that a defendant's due process rights to a fair trial are protected as long as disclosure of Brady impeachment material is made the day that the government witnesses are scheduled to testify in court. Higgs, 713 F.2d at 44.

In this case, the government requests authorization to provide Thomas with Brady impeachment material three days before trial when it provides him with Jencks material. The government makes this request because of Thomas' attempt to solicit CS2's assistance in preventing a potential witness from testifying in this case. See government Response at 32. The government's request is consistent with the case law cited herein, and the court will enter an order requiring the government to disclose Brady impeachment material three days prior to trial.

Finally, regarding Thomas' motion for discovery regarding recorded phone calls that pertain to him, Thomas asserts without citation to any authority that the government is obligated "to identify which specific items of electronic surveillance are

25

relevant to and concern [him]" because that information is known by the government but "virtually impossible" for defense counsel to uncover. <u>See</u> Document No. 165 at 2. The government responds that is has provided Thomas with copies of all recorded conversations to which he was a party. <u>See</u> government's Response at 41. The government is not otherwise obliged to specifically list for defense counsel which calls involve Thomas or which calls the government may rely upon at trial. Accordingly, Thomas' discovery motion concerning recorded phone calls will be denied.

### D. <u>Motion to Compel Disclosure of Plea Bargains, Preferential Treatment and Promises to Government Witnesses (Document No. 166) and Motion to Require the Government to Reveal any Agreement, Concession or Grant of Immunity (Document No. 174)</u>

Thomas has filed a motion requesting that the government disclose "forthwith" any plea bargains, preferential treatment and promises made by the government to potential witnesses, <u>see</u> Document No. 166, as well as a motion requiring the government to disclose any agreement, concession or grant of immunity made to witnesses who may testify at trial. <u>See</u> Document No. 174. These motions in effect request <u>Brady</u> impeachment material, which includes <u>Giglio</u> material, or evidence that relates to a confidential informant's or a co-conspirator's deal with the government for leniency. <u>Giglio v. United States</u>, 405 U.S. 150, 154-55 (1972).

As discussed above, the government has requested authorization to provide Thomas with <u>Brady</u> impeachment material

26

three days prior to trial. Such disclosure complies with relevant Third Circuit case law. See Higgs, 713 F.2d at 44 (holding that disclosure of Brady impeachment material can be made the day that government witnesses are to testify at trial without violating defendant's due process rights). Accordingly, an order will be entered requiring the government to provide Thomas with Brady impeachment material three days before trial.

**E.    Motion to Dismiss (Document No. 169)**

Thomas has moved to dismiss the indictment on the grounds that the government's alleged delay in indicting him has prejudiced him in defending against the charges. Thomas also contends that the indictment should be dismissed because the government presented evidence to the grand jury that he alleges was obtained illegally. Thomas cites no support for either of his arguments.

First, with respect to Thomas' delay argument, the statute of limitations provides the primary safeguard against the initiation of stale criminal charges. See United States v. Marion, 404 U.S. 307, 322 (1971); United States v. Ismaili, 828 F.2d 153, 167 (3d Cir. 1987). Where an indictment is returned within the limitations period, it may be dismissed only if delay sufficiently oppressive to violate the Due Process Clause is present. Marion, 404 U.S. at 324. To establish this type of delay, the defendant bears the burden of proving two essential facts: "(1) that the

27

government intentionally delayed in bringing the indictment in order to gain some advantage over him, and that (2) this intentional delay caused the defendant actual prejudice." Ismaili, 828 F.2d at 167 (citing Marion, 404 U.S. at 325).

Here, Thomas is charged in Count One of the indictment with conspiring to distribute and possessing with intent to distribute cocaine from in or around 1998 until August 28, 2006. Thomas also is charged with possessing with intent to distribute and distributing cocaine on or about May 23, 2006 (Count Two) and on or about July 21, 2006 (Count Three). Thomas was indicted on August 30, 2006. Thus, contrary to Thomas' assertion, the government did not delay in indicting him. Moreover, because there was no delay in this case, Thomas is unable to show that he has suffered prejudice.

Thomas also alleges that statements obtained illegally by the government on July 15, 2006, were presented to the grand jury. As discussed in Part II, supra, the statements about which Thomas complains are not subject to suppression. Thomas otherwise has not identified any facts to support his contention that the government presented evidence to the grand jury that was obtained illegally. However, even if tainted evidence had been submitted to the grand jury, the indictment would not be subject to dismissal. See United States v. Calandra, 414 U.S. 338, 345 (1974) ("an indictment valid on its face is not subject to

28

challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence"); <u>United States v. Blue</u>, 384 U.S. 251, 255 n.3 (1966) (tainted evidence "would not be a basis for abating the prosecution pending a new indictment, let alone barring it altogether"). For this reason, and those stated above, Thomas' motion to dismiss the indictment will be denied.

**F.  Motion for Early Disclosure of Jencks Material and Motion toProhibit Disclosure of Jencks Material in the Jury's Presence (Document Nos. 170 and 172)**

Thomas has moved for an order compelling the government to disclose Jencks Act material 30 days prior to trial. <u>See</u> Document No. 170. In addition, Thomas requests that the government be prohibited from providing his counsel with Jencks material in the jury's presence. <u>See</u> Document No. 172.

The Jencks Act, 18 U.S.C. §3500(b), requires the government to disclose prior recorded statements of its witnesses, when related to the subject matter of their testimony, after each witness testifies on direct examination. <u>United States v. Weaver</u>, 267 F.3d 231, 245 (3d Cir. 2001). According to 18 U.S.C. §3500(a), "no statement or report in the possession of the United States which was made by a government witness or prospective government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection <u>until said witness has testified on direct examination in the trial of the case.</u>"

There is no authority by which this court can order the

29

government to provide Jencks Act statements prior to the time the witness has testified on direct examination at trial. However, the government has indicated that it will provide Thomas with Jencks Act material three days prior to trial, <u>see</u> government's Response at 30, and the court will enter an order encouraging the government to do so.

Thomas has not cited any authority to support his request that the government should be prohibited from providing his counsel with Jencks material in the jury's presence. Nonetheless, since the government has agreed to turn over Jencks material three days prior to trial, Thomas' motion regarding disclosure of such material in the jury's presence will be denied as moot.

### G.  **Motion for Disclosure of Additional Rule 404(b) Evidence (Document No. 171)**

Thomas has filed a motion to disclose uncharged misconduct evidence which the government intends to offer at trial pursuant to Fed.R.Evid. 404(b).[8]

Rule 404(b) requires the government to provide reasonable notice prior to trial of its intention to use evidence of other crimes, wrongs or acts for the purposes enumerated in the rule. It provides "that upon request by the accused, the prosecution in

---

[8]Thomas also suggests in his motion at ¶11 that a pretrial hearing is necessary on the admissibility of any potential Rule 404(b) evidence. However, it would be premature to rule on the potential admissibility of Rule 404(b) evidence until such evidence is considered in the context of trial. Accordingly, no pretrial hearing is required.

30

a criminal case shall provide reasonable notice in advance of trial ... of the general nature of any such evidence it intends to introduce at trial." According to the commentary to Rule 404(b), other than requiring pretrial notice, no specific time limits are stated in recognition that what constitutes reasonable notice will depend on the circumstances of each case. Courts that have considered what constitutes "reasonable notice" have concluded that notice of intent to use Rule 404(b) evidence seven to ten days prior to trial is sufficient. See United States v. Evangelista, 813 F.Supp. 294, 302 (D.N.J. 1993) (ten days); United States v. Alex, 791 F.Supp. 723, 728-29 (N.D.Ill. 1992) (seven days); United States v. Williams, 792 F.Supp. 1120, 1133 (S.D.Ind. 1992) (ten days).

The government requests that it be permitted to provide the notice required by Rule 404(b) ten days prior to trial. See government's Response at 18. The government's request is consistent with the case law discussed above. Accordingly, the court will grant Thomas' motion to the extent he seeks advance notice of Rule 404(b) evidence and enter an order directing the government to provide the required notice ten days before trial.

### H. Motion to Require Law Enforcement Personnel to Retain Rough Notes (Document No. 173)

Thomas has filed a motion to require the government to retain all rough notes and writings of its investigating agents which may constitute Brady or Jencks materials. In United States v. Vella,

31

562 F.2d 275, 276 (3d Cir. 1977), the Third Circuit held that rough interview notes should be preserved so that the court can determine whether they should be made available to the defendant under Brady or the Jencks Act. See also United States v. Ammar, 714 F.2d 238, 259 (3d Cir. 1983) (extending rule to require preservation of drafts of agents' reports). The government has indicated that it is aware of its obligation to retain these materials and will do so to the extent any such items exist. See government's Response at 22-23. Accordingly, the court will grant Thomas' motion to require retention of rough notes and order the government to preserve any such materials.

### I.    **Motion for James Hearing (Document No. 175)**

Thomas has moved for a pretrial hearing pursuant to United States v. James, 590 F.2d 575 (5th Cir. 1979), to determine the admissibility of statements of alleged co-conspirators under the exception to the hearsay rule set forth in Fed.R.Evid. 801(d)(2)(E).[9]

The government argues that a pretrial determination as to the

---

[9]Pursuant to Rule 801(d)(2)(E), "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), the government must establish by a preponderance of the evidence: (1) that there was a conspiracy involving the declarant and the non-offering party; and (2) that the statement was made during and in furtherance of the conspiracy. Bourjaily v. United States, 483 U.S. 171, 175 (1987).

admissibility of co-conspirator statements is neither practical nor necessary in this case. Instead, the court should look to the trial testimony as a whole in determining whether there was a conspiracy, whether Thomas and the declarant were members of that conspiracy and whether the statements were made during and in furtherance of the conspiracy.

In this circuit, there is no authority for holding a separate hearing on the admissibility of co-conspirator statements. <u>See</u> <u>Ammar</u>, 714 F.2d at 246-47. In addition, "the control of the order of proof at trial is a matter committed to the discretion of the trial judge," <u>United States v. Continental Group, Inc.</u>, 603 F.2d 444, 456 (3d Cir. 1979), and it is well settled that a Rule 104 hearing need not be conducted in every case where the government seeks to introduce a co-conspirator's statements against a defendant. <u>Ammar</u>, 714 F.2d at 247. Because the court finds no authority for a mandatory pretrial hearing on the admissibility of co-conspirator statements, and the tendency is to yield to the trial court's discretion as to the order of proof at trial, Thomas' motion for a pretrial <u>James</u> hearing will be denied.

## J. **Motion for Leave to File Additional Pretrial Motions (Document No. 176)**

Thomas requests that the court enter an order permitting him to file additional pretrial motions as may become necessary. The court will grant Thomas' request to the extent that he only may file additional motions which reasonably could not have been

33

anticipated within the time allocated for filing motions in this case.

## IV.   Conclusion

For the foregoing reasons, defendant's motion to suppress evidence will be granted in part and denied in part, and his other pretrial motions will be granted and denied as stated herein.

An appropriate order will follow.

_Gustave Diamond_
Gustave Diamond
United States District Judge

Date: _November 19, 2009_

cc:   Constance M. Bowden
      Assistant U.S. Attorney

      James J. Brink, Esq.
      428 Forbes Ave.
      Suite 220
      Pittsburgh, PA 15219

34